1

1   UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF FLORIDA
2   WEST PALM BEACH DIVISION

3   Case No. 9:20-cv-80945-DMM

4   STEPHEN BOVE,

5              Plaintiff,

6   -vs-

7   XPO LOGISTICS EXPRESS, LLC.,
    DEJAH XPRESS LLC, and KIMBERLY
8   SANDERS,

9              Defendants.
    _____/

10

11

12          DEPOSITION OF DAVID M. CADES, PH.D.
                  Pages 1 Through 88
13             (VIA ZOOM VIDEOCONFERENCE)

14
            Taken on behalf of the Plaintiff
15

16             Tuesday, January 19, 2021
                 10:58 a.m. - 1:15 p.m.
17

18

19

20

21       Examination of the witness taken before:

22
                 Nancy Cannizzaro, RMR
23             Transcript Solutions, LLC
        1555 Palm Beach Lakes Boulevard, Suite 1420
24           West Palm Beach, Florida 33401
                    (561) 612-8700
25       Located in Palm Beach County, Florida



2

 1                    REMOTE APPEARANCES

 2

 3      On behalf of the Plaintiff:
             MURRAY GUARI TRIAL ATTORNEYS PL
 4           1525 N. Flagler Drive
             Suite 100
 5           West Palm Beach, Florida 33401
             561.366.9099
 6           smurray@murrayguari.com
             BY:  SCOTT C. MURRAY, ESQUIRE
 7

 8      On behalf of the Defendants:
             NICKLAUS & ASSOCIATES, P.A.
 9           4651 Ponce De Leon Boulevard
             Suite 200
10           Coral Gables, Florida 33146
             305.460.9888
11           edwardn@nicklauslaw.com
             eddyn@nicklauslaw.com
12           BY:  EDWARD R. NICKLAUS, ESQUIRE
                  EDWARD A. NICKLAUS, ESQUIRE
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX OF PROCEEDINGS

2       WITNESS                                              PAGE

3       DAVID M. CADES, Ph.D.
               DIRECT EXAMINATION BY MR. MURRAY                4
4
        CERTIFICATE OF OATH                                   85
5       REPORTER'S DEPOSITION CERTIFICATE                     86
        READ & SIGN LETTER TO WITNESS                         87
6       CORRECTION SHEET                                      88

7

8

9                              PLAINTIFF EXHIBITS

10      EXHIBIT                    DESCRIPTION               PAGE

11      No. 1        Rule 26 Expert Disclosure with           9
                     attachments
12
        No. 2        Request for documents                   28
13
        No. 3        11/26/20 Invoice                        34
14
        No. 3A       12/11/20 Invoice                        39
15
        No. 3B       1/7/21 Invoice                           41
16
        No. 5        List of Materials                       12
17
        No. 6        Updated Testimony List                  27
18
        No. 7        Timeline                                 80
19

20

21                             DEFENSE EXHIBITS

22                          (NO EXHIBITS MARKED)

23

24

25

4

1    Thereupon,

2                        DAVID M. CADES, PH.D.,

3                        being a witness in the notice heretofore

4    filed, and being first duly sworn in the above cause,

5    testified on his oath as follows:

6                   THE WITNESS:  Yes, ma'am, I do.

7                        DIRECT EXAMINATION

8    BY MR. MURRAY:

9         Q.   Good morning.  My name is Scott Murray.

10   I'm one of the attorneys representing the plaintiff,

11   Stephen Bove, in this case.

12                   Why don't you go ahead and just tell us

13   your name and your professional address.

14        A.   Sure.  My name is Dr. David Cades.  Last

15   name is spelled C-a-d-e-s.  And my address here at the

16   office is 525 West Monroe Street, Suite 1050, Chicago,

17   Illinois 60661.

18        Q.   And so you pronounce your name Cades?

19        A.   Yes, sir.

20        Q.   Okay.  Thank you.  I would have -- I would

21   have butchered that.  Sorry about that.

22        A.   Not a problem.

23        Q.   You're employed by Exponent, Inc.; is that

24   right?

25        A.   Yes, sir.  That's correct.

```
 1              Q.    All right.  And then someone by the name of
 2      Christina Cloninger also worked on the file, a senior
 3      scientist; is that right?
 4              A.    Yes, sir.
 5              Q.    What was her role or is her role?
 6              A.    Dr. Cloninger is a human factors scientist,
 7      senior scientist who works at my direction.  So she
 8      assisted in the review and the report.
 9              Q.    All right.  How about associate Patrick
10      Comiskey?
11              A.    I believe he has a Ph.D.  I don't know why
12      that's not on there.  Dr. Comiskey is in our vehicle
13      practice, and he was looking at the video to see what, if
14      anything, could be done from a speed calculation and
15      things of that nature before I had gotten that
16      information from Mr. Melcher and Mr. Vadnais.
17              Q.    And did you ultimately rely on the
18      information provided to you by Mr. Melcher and
19      Mr. Vadnais?
20              A.    Aspects of the information provided by
21      both, I did rely on, yes.
22              Q.    Do you -- was there anything in particular
23      that you did not rely on?
24              A.    Well, I mean, certainly the aspects of
25      either of their work that have nothing to do with my
```

```
 1    trailer northbound on the turnpike in Palm Beach County
 2    when the accident occurred?
 3         A.    I have it in West Palm Beach, Florida.  I
 4    assume that's Palm Beach County, but I don't have that
 5    specifically in front of me.
 6         Q.    Okay.  Fair enough.  And at the time of the
 7    accident, you're aware Ms. Sanders had a valid commercial
 8    driver's license required to operate the tractor trailer?
 9         A.    That is my understanding, yes.
10         Q.    Okay.  And at the time of the accident,
11    there were adverse weather conditions, including some
12    rain and wet roads?
13         A.    There had been rain.  It's unclear even
14    from the video where and when it was actively raining,
15    but the roads were wet.  There was water spraying up in
16    the roughly -- at least in the minutes leading up to the
17    incident.
18         Q.    Okay.  Are you more comfortable with, you
19    know, in terms of the adverse weather conditions, that
20    there was intermittent rain and certainly wet roads,
21    right?
22         A.    I think that would be fair.  Again, you
23    know, just the idea that it was -- was or was not raining
24    at the time this incident occurred in the area this
25    incident occurred, I couldn't quite tell.  It did not
```

```
 1    look like it was actively raining.  But, you know, you
 2    all know Florida better than I do and the way those
 3    storms can kind of pop up and disappear.
 4         Q.    True.  But in the moments, you know, maybe
 5    the minute -- at least under the dash cam video, which I
 6    think is 54, 55 seconds long, in terms of capturing the
 7    events leading up to the impact, Ms. Sanders had her
 8    windshield wipers engaged, correct?
 9         A.    Yes, sir.
10         Q.    And the posted speed limit in the area was
11    70 miles per hour; is that right?
12         A.    Yes, sir.
13         Q.    Now, in your report, you have a couple of
14    sections where you, you know, reference Mr. Vadnais --
15    and forgive me if I'm mispronouncing his name -- Vadnais'
16    findings as well as Mr. Melcher's findings, correct?
17         A.    I have two sections in my report on --
18    beginning on page 8, going on to page 9, where I provide
19    a summary of Mr. Melcher and Mr. Vadnais' report.
20         Q.    All right.  Let's see if we're sort of on
21    the same page in terms of some of the accident
22    reconstruction facts and speeds and so forth, and let me
23    understand if you agree with these.
24              The tractor trailer, I guess, was traveling
25    about 70 miles an hour up until about 18 seconds before
```

1    the impact, at which time it began to slow to 68 miles

2    per hour.  Does that sound right?

3         A.    That's Mr. Melcher's description.  I think

4    you'll have to ask Mr. Vadnais about the specifics, but I

5    think within a mile or two, they're pretty much in

6    agreement at that point.

7         Q.    Right.  That's what I sort of figured as

8    well.

9              In about 8.2 seconds before the impact,

10   basically in response to the traffic conditions ahead,

11   Ms. Sanders slowed from 58 miles an hour -- sorry, slowed

12   from 68 miles an hour to 58 miles an hour over about

13   3.4 seconds?

14        A.    Again, subject to whether Mr. Vadnais might

15   disagree by a mile or 2 or .1 or 2 seconds, I think

16   that's fairly accurate.

17        Q.    I don't know -- if you look at -- I'm not

18   sure if it was in your report.  I think I'm referring to

19   Mr. Vadnais' numbers there, but let me just look here.

20        A.    I actually have his report.  I have the

21   expert reports printed out as well.  I just find it

22   easier sometimes.

23        Q.    Again, just looking at your report, page 9,

24   under the Summary of Defendant Expert Thomas Vadnais,

25   P.E.'s preliminary accident reconstruction report,

1    Mr. Vadnais' analysis concluded -- and I'm quoting

2    here -- "Mr. Vadnais' analysis concluded that

3    Ms. Sanders' tractor trailer would have a deceleration

4    rate averaging 12.2 feet per second squared from the time

5    she began slowing from 58 miles per hour to an impact

6    speed of approximately 18 miles an hour over the course

7    of 4.8 seconds."  Did I read that correctly?

8          A.    Yes, sir, you did.  And I see the previous

9    point here.  I believe you read those numbers correctly

10   too.  I didn't have them in front of me, so I didn't want

11   to lock Mr. Vadnais into anything, but I do believe you

12   read them correctly.

13         Q.    Okay.  Thank you.  And I guess about five

14   seconds before impact, Ms. Sanders begins yelling "shit"

15   or whatever, a few expletives; is that right?

16         A.    A little bit before five seconds before

17   impact, like you said, approximately, there's an audible

18   response from Ms. Sanders.

19         Q.    And 4.8 seconds prior to impact,

20   Ms. Sanders engages, basically, full emergency braking.

21   That's when the truck decelerates from 58 miles per hour

22   down to 18 miles per hour at the point of impact,

23   correct?

24         A.    I believe they both characterize it as hard

25   braking there.  Again, I don't have an opinion if it was

49

```
 1    full or almost full.  You'll have to talk to Mr. Vadnais
 2    about that.
 3           Q.    Sure.  And I guess Mr. Vadnais concluded
 4    that Ms. Sanders needed another 29 feet to come to a
 5    complete stop.  Do you recall that?
 6           A.    Yes, sir.
 7           Q.    All right.  So prior to Ms. Sanders
 8    physically engaging the brake to slow down from that
 9    58 miles per hour down to 18 miles per hour over
10    4.8 seconds, prior to that time there would have been
11    some interval of time necessary for her to perceive and
12    respond to the change in conditions ahead of her, right?
13           A.    I want to be a little careful that we don't
14    define it as this discreet individual perception
15    response.  I think the way you phrased it is okay.  It's
16    an ongoing process.  And so her ability to -- I think --
17    again, I think you said it well -- to perceive and
18    respond to the changing conditions, I'm comfortable with
19    that.
20           Q.    Okay.  And, I mean, that interval, you
21    refer to it as a perception response time; is that right?
22           A.    Correct.
23           Q.    All right.  And that perception response
24    time basically starts when the -- I guess the driver, you
25    know, identifies or detects a hazard and then stops when
```

1   they initiate a response to that hazard?

2          A.   Yeah.  And, again, in terms of measuring a

3   discreet action in a laboratory or where you've got a

4   single piece of visual or other information, I think

5   that's a fair and accurate description.  When we then

6   take it and apply it to the real world, it's important to

7   understand that we are constantly, as humans, as drivers,

8   perceiving and responding to things in the environment

9   even if it's not discreet like that.  And so, you know,

10  without losing sight of the ongoing process that a driver

11  is always doing, then, you know, in a box, yes, your

12  description is correct.

13         Q.   All right.  And in this case, because of

14  the adverse weather conditions, Ms. Sanders was

15  experiencing some reduced visibility, right?

16         A.   That is certainly supported by the science,

17  as well as her own testimony.

18         Q.   And that would have resulted, presumably,

19  in a longer or increased perception response time?

20         A.   Again, you want to be real careful here

21  about prescribing this to her individually.  But for an

22  alert and attentive driver in her position, just like she

23  was, generally a driver, yes.  All else being equal,

24  adverse weather conditions such as those present at the

25  time of this incident have been shown in the literature

51

1   to be associated with extended perception response times.

2       Q.   I mean, do you have an opinion about what

3   Ms. Sanders' perception response time was just prior to

4   engaging her brakes 4. seconds before impact?

5       A.   I'd say that -- and, again, this is where

6   it gets a little tricky -- is that she -- there were a

7   number of different actions that she took.  And I don't

8   believe it's possible to say that -- and this is where

9   Mr. Melcher errors, in my opinion.  It's not possible to

10  say that Ms. Sanders' perception response time was a

11  number.  It's not -- there were so many different things

12  occurring in the developing nature of this situation that

13  it would be inappropriate to say, "I know she reacted to

14  this car or to this light or to this water particle."

15          Now, that being said, it is appropriate to

16  think of a general range of what you would expect a

17  reasonable driver to do.  And in that respect, I don't

18  disagree with the range Mr. Melcher used, 1.2 to -- using

19  1.9 might be a little -- getting up there a little bit,

20  but his 1.2 to 1.9 range, that's generally fine.  So

21  somewhere in the 1.2 to 1.5, maybe a little longer, would

22  be a reasonable range for a driver in this situation to

23  react.

24      Q.   Well, based on some of the literature you

25  cited in your report, isn't the 1 to 1.5 range for

```
 1    someone -- a driver experiencing an unexpected obstacle

 2    under daytime conditions?

 3              A.    Correct.

 4              Q.    All right.  And that was not the scenario

 5    that Ms. Sanders faced, correct?

 6              A.    Correct.  And that's why I said it could be

 7    longer.

 8              Q.    That's why, again, I'm trying to clarify

 9    too.  Initially, you say you're generally okay with

10    Mr. Melcher's range, 1.2 to 1.9, with 1.9 maybe being a

11    little high, but then you said, you know, that you

12    thought it was reasonable to be in the 1.2 to 1.5 range.

13              That's a better range for this scenario?

14              A.    Yeah.  So I think -- I think I understand

15    where your confusion is, Mr. Murray.  You know, in

16    looking at the video and what happened, and Mr. Melcher

17    saying that, you know, 1.2 to 1.9 captures what she did,

18    I think that's generally fair, because that, I think,

19    captures a larger range of what was developing and the

20    time course in which it was developing.

21              The one -- him saying that she responded

22    1.6 seconds after -- I have to look back at his chart,

23    but I believe -- bear with me one sec here.  And so,

24    yeah, he has this 1.6 number that he's locking to, it

25    looks like, what he called F-150 crossing the fog line.
```

53

1    And so that I have a problem with.  As a general range,

2    could a driver in her position reasonably react in below

3    1.9, below 2.5?  Absolutely.  I think there's evidence

4    that she did.  That being said, had it taken her longer

5    to react, that would be reasonable.

6         Q.    Do you agree that it's unlikely that she

7    could react in half a second?

8         A.    It's -- I mean, is that within the realm of

9    human ability?  Sure.  I mean, if your foot is already on

10   the brake, you get rid of movement time, which your foot

11   was, and there's something to react too, sure.  In this

12   situation, I would not expect a driver to react in a half

13   a second.

14        Q.    All right.  Seems too short, right, under

15   this situation?

16        A.    Again, you know, it's in the realm of human

17   ability, but I do believe that, all else being equal,

18   that would be a little quick for this type of situation.

19        Q.    When Ms. Sanders was providing, as you call

20   it, a verbal response, she had begun to do that prior to

21   the F-250 in front of her brake light illuminating,

22   correct?

23        A.    That is consistent with my recollection,

24   yes.

25        Q.    So you would agree that her initiation of

54

1      that braking, whether you call it hard braking, full

2      emergency, however you want to describe it, 4.8 seconds

3      before impact was not in response to any of the brake

4      lights on the F-250?

5            A.     And so just to make sure we're talking

6      about the right vehicle, because I know there was some

7      VIN confusion in Mr. Melcher's deposition, we're talking

8      about the vehicle that had the wood planks on the back,

9      correct?

10           Q.     Yes, sir.

11           A.     Okay.  So just to clarify, my understanding

12     is that there were not brake lights on that vehicle.

13     There was only a single, small, obscured brake light.  So

14     just a minor clarification there.

15                  And, again, based on what I understand a

16     reasonable driver, like Mr. -- like Ms. Sanders was,

17     perception response time to be in a situation like this,

18     combined with her -- you know, her verbal response and

19     the actions of the vehicle, as well as her description of

20     events in the questionnaire and her testimony, what she

21     was reacting to was her understanding, once that spray

22     cleared, that she was closing on this vehicle very

23     quickly and that she needed to brake.

24           Q.     And that's irrespective of whether there

25     was one brake light or no brake lights or two brake

```
 1   lights?

 2        A.    So, you know, again, just to be very clear,

 3   her perception at that moment was not relying on the

 4   brake lights or lack thereof.  However, had there been

 5   brake lights, that would have provided more information.

 6        And so what you can't see in the video

 7   earlier on is, you know, while -- for instance, that

 8   white vehicle, I think it was white, that was in front of

 9   her just prior to it moved to the left, which it then

10   precipitated the events of when she saw the wood plank

11   truck, you know, it's not clear if there were brake

12   lights on any of the vehicles up ahead prior to that.

13   And so the -- that they were not functional deprived her

14   of any opportunity to see them.

15        Q.    Whenever it was that the operator of the

16   truck with the lumber applied the brakes, you're aware

17   that he applied them in time so as not to strike the

18   vehicle in front of him and come to a complete stop?

19        A.    It is my understanding that he did not

20   contact anyone in front of him prior to this incident.

21        Q.    Are you aware of Florida traffic laws that

22   require, regardless of what the posted speed limit,

23   maximum speed limit is, that drivers reduce their speed

24   when experiencing adverse weather conditions?

25        A.    I don't -- as I sit here right now, I don't
```

56

```
 1    know that I'm aware of a specific law.  I may have, in
 2    the course of my career, reviewed that.  I know that's
 3    generally good driving practice.
 4           Q.    I think you testified that Ms. Sanders was
 5    in fact experiencing adverse weather conditions,
 6    including wet roads at and before the moment of impact?
 7           A.    Yes, sir.
 8           Q.    And would you agree that at the speed she
 9    was traveling, she just could not stop in time to avoid
10    striking the vehicle in front of her?
11           A.    The -- what I would say is, with everything
12    that we've talked about and that we've seen in this
13    incident, whether it was the speed or the amount of
14    braking, the combination of variables that went into this
15    specific incident did not allow her to avoid contact.
16    You know, she got down pretty slow, but did not avoid
17    contact.
18           Q.    Having reviewed Mr. Melcher's deposition
19    and report, are you aware of his testimony that had
20    Ms. Sanders slowed down even three miles per hour, that
21    this accident could have been avoided?
22           A.    I'm aware of that.  I'm aware of where he
23    said had she reacted a quarter of a second earlier, the
24    accident could have been avoided.  And, again, I think,
25    if anything, that supports the conclusion that she was
```

1    alert, attentive, and acting reasonably.

2          Q.   Well, someone can be alert and attentive

3    unrelated to the speed at which they're traveling,

4    correct?

5          A.   I think I'm comfortable with that.

6          Q.   All right.  In this case, at the speed that

7    Ms. Sanders was traveling, she could not stop in time to

8    avoid striking the vehicle in front of her, right?

9          A.   Yeah.  I'll answer that the same way as

10   when you just asked the exact same question a minute ago.

11   It's the combination.  Whether it was the speed or her --

12   you know, the specific reaction time or the braking or

13   the combination did not allow her to avoid contacting the

14   vehicle in front of her.

15         Q.   It's your testimony that Ms. Sanders is --

16   bears no responsibility at all, correct, for causing this

17   accident?

18         A.   So I know, you know, apportioning fault is

19   a question for the jury.  What I'm testifying about is

20   whether or not Ms. Sanders -- in the context of this line

21   of questioning, whether or not Ms. Sanders was acting

22   reasonably and whether she was a reasonable driver, and

23   it's my opinion that she was.

24         Q.   All right.  So it's your opinion that

25   driving a tractor trailer on a wet road at 68 miles per

58

```
1    hour is reasonable?
2          A.    Given the conditions that were present and
3    what was available to her, yes.
4          Q.    And you understand that driving at 68 miles
5    per hour in a tractor trailer on a wet road, in her
6    circumstance, did not allow her to stop in time without
7    striking the vehicle in front of her?
8               MR. NICKLAUS:  Object and asked and
9          answered.
10         A.    Yes.  I understand that.  And if it were
11   not for the sudden and emergent and unexpected hazard,
12   then there would have been nothing for her to have to
13   brake to avoid.
14   BY MR. MURRAY:
15         Q.    What hazard are you -- what emergent and
16   unexpected hazard are you referring to?
17         A.    The sudden stopped vehicles that were
18   revealed to her after the vehicle in front of her moved
19   out of the way and the spray cleared.
20         Q.    Would you agree that Ms. Sanders did not
21   leave enough assured, you know, clear distance ahead of
22   her prior to impact?
23         A.    I don't agree with that.
24         Q.    Why?
25         A.    The -- my -- and, again, I understand
```

61

1    BY MR. MURRAY:

2         Q.    Dr. Cades, with all due respect, you just,

3    you know, took it to some ridiculous levels.  My question

4    was simply, had she adjusted her speed a little bit

5    slower, you know, that this accident would have been

6    avoided?

7         A.    Possibly.

8         Q.    As an alert, attentive, knowledgeable

9    driver, do you assume that she was aware that the, you

10   know, friction capabilities of a tractor trailer are

11   different than that of a passenger car?

12        A.    I don't know that she -- and I haven't seen

13   where she testified that -- about her knowledge of

14   friction on tractor trailers versus passenger cars.  I

15   certainly saw where she testified and has reviewed

16   materials with respect to the stopping ability of tractor

17   trailers.

18        Q.    Dr. Cades, isn't it a good idea for a

19   driver, especially a driver of a tractor trailer, to

20   reduce their speed before a potential hazard becomes an

21   actual hazard?

22        A.    Not universally, no.

23        Q.    Well, how about in a situation where she

24   had been driving on wet roads in intermittent rain?

25        A.    So in the 30 minutes prior to this area,

1   we look to studies that have been done -- and

2   understanding while there's 60 subjects in an experiment

3   and they all generate data, okay, you can look at the

4   measures of central tendency.  And so with respect to

5   speed reduction of those 60 people, in light rain, heavy

6   rain, no rain, what did their speeds look like?  And that

7   allows us to understand what drivers do.

8            And when you see multiple studies that kind

9   of show the same thing, it gives you an understanding of

10  what you would expect people to do.  And so in assessing,

11  from a human factors perspective, whether someone is

12  acting reasonably, I want to know, are they doing what we

13  expect them to do?  And in this case, Ms. Sanders was

14  doing what I would expect a reasonable driver to do based

15  on that literature.

16           Q.    Well, you're aware that the vehicle

17  dynamics of a tractor trailer are very different from

18  those of a passenger car, correct?

19           A.    Yeah.  I know they are certainly different.

20  But, you know, I defer to Mr. Vadnais or Mr. Melcher to

21  some extent on how different.

22           Q.    Well, you understand they're -- you know,

23  it's more difficult to bring a tractor trailer to a stop

24  than it is for a passenger car under the same

25  circumstances?

1   including braking capability, road friction, that all

2   goes into your decision for speed selection, right?

3        A.    Potentially, sure.

4        Q.    And so you would agree a driver should

5   select a speed to travel at that would -- so that they

6   can perceive, react, and brake in time to avoid striking

7   a vehicle in front of them, right?

8        A.    In a -- I mean, in a perfect world, that

9   sounds great.  That's not realistic.  And it's not

10  realistic because there are -- there are hazards that

11  could be unavoidable from an alert and attentive and a

12  reasonable driver.  And so certainly drivers should

13  adjust their speed, and that -- you know, that you

14  described, Mr. Murray, that is absolutely something that

15  could be considered in speed selection and speed

16  adjustment.

17            However, as we talked about earlier,

18  there's a lot of different considerations that also have

19  to be taken into account.  You know, if a driver wanted

20  to be able to avoid 99.99 percent of these incidents,

21  well, a driver can either not ever drive, which, again,

22  as we talked about, is ridiculous, or drive at such a

23  slow speed that may cause additional hazards for the rest

24  of the motoring public.  And so there really is a balance

25  that needs to be struck.

75

1   nature of this, were not able to maintain their lane

2   position in order -- quite possibly in order to avoid

3   striking other objects in the road.  And so I think

4   there's evidence to support that this was a more sudden

5   and emergent stopping, that was not something that a

6   typical, reasonable driver would expect.

7   BY MR. MURRAY:

8       Q.    Well, you would agree with me that there

9   were no other vehicles, in reviewing the dash cam, that

10  struck the rear of the vehicle in front of them before

11  Ms. Sanders, you know, struck the vehicle with the

12  lumber, that then caused that vehicle to strike my

13  client's vehicle, which then caused my client's vehicle

14  to strike another vehicle?

15      A.    Yes.  And part of that is that you've got a

16  vehicle who left the roadway and collided with a cable

17  barrier, and you've got another vehicle who pulled onto

18  the shoulder, which, you know, again, helped that driver

19  avoid an incident, but then also deprived Ms. Sanders of

20  a potential option to avoid, leaving her with no other

21  option but braking.

22      Q.    And there were lots of vehicles that were

23  able to stop as well, right, without striking the

24  vehicles in front of them?

25      A.    That's my understanding, yes.